**I.T.O. CORPORATION
OF BALTIMORE,
Petitioner,**

v.

**William SELLMAN; Director, Office of
Workers' Compensation Programs,
United States Department of Labor, Re-
spondents.**

No. 90–1531.

United States Court of Appeals,
Fourth Circuit.

Argued April 10, 1991.

Decided Jan. 22, 1992.

As Amended March 2, 1992.

Stan Musial Haynes and Rudolph Lee Rose, Semmes, Bowen & Semmes, Baltimore, Md., argued, for petitioner.

Joshua T. Gillelan, II, Office of the Sol., U.S. Dept. of Labor, Washington, D.C., argued (Robert P. Davis, Sol. of Labor, Carol A. De Deo, Associate Sol., and Janet R. Dunlop, Counsel for Longshore, Office of the Sol., U.S. Dept. of Labor, on brief), for respondent Director.

Paul David Bekman, argued (Laurence A. Marder, on brief), Israelson, Salsbury, Clements & Bekman, Baltimore, Md., for respondent Sellman.

Before RUSSELL, Circuit Judge, CHAPMAN, Senior Circuit Judge, and WILLIAMS, United States District Judge for the Eastern District of Virginia, sitting by designation.

## OPINION

DONALD RUSSELL, Circuit Judge:

This case arises out of a claim filed under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901–950 (1986). Employer, I.T.O. Corporation of Baltimore ("I.T.O."), appeals from a decision of the Benefits Review Board ("Board") affirming an administrative law judge's (ALJ) decision denying I.T.O.'s request to terminate compensation and medical benefit payments or, alternatively, to offset its liability against settlement proceeds received by the claimant, William Sellman, through a third-party settlement agreement. We agree with the Board that I.T.O. may not terminate benefit payments, but reverse its determination that I.T.O. is not entitled to an offset.

There is no dispute in this case concerning William Sellman's disability status. Sellman suffered a fall on July 10, 1979, while working on a ship known as the *Algenib* for I.T.O.'s predecessor, resulting in a fractured skull and paralysis. I.T.O.

voluntarily paid compensation and medical benefits for total disability from July 11, 1979, until July 21, 1984. I.T.O. refused to make further payments after this date because Sellman refused to transfer to I.T.O. funds he received from a settlement of his third-party suit against the owners of the *Algenib*.

I.T.O., Sellman, and his wife [1] and children filed suit against the *Algenib* defendants in 1982 which culminated in two settlement agreements executed in June 1984. One agreement ("I.T.O. agreement") called for the payment of $250,000 to I.T.O. The agreement provided that it would have "no force and effect" until "the companion Settlement Agreement of the Sellmans is approved by the Circuit Court for Baltimore County...." The I.T.O. agreement was signed by Mrs. Sellman, William's attorney, and the attorneys for I.T.O. and the *Algenib* defendants.

The second agreement ("Sellman agreement") required the *Algenib* defendants to pay $250,000 to the Sellmans in satisfaction of any claims against them. The Sellmans had filed nine causes of action against the *Algenib*, including one cause of action for loss of consortium. The Sellman agreement was signed by Mrs. Sellman, the Sellmans' attorney, Roger Smith, and the attorney for the *Algenib* defendants, Geoffrey Tobias. Like the I.T.O. agreement, the Sellman agreement was contingent upon approval by the Baltimore Circuit Court. Both agreements referenced I.T.O.'s alleged compensation lien. At the time the settlements were reached, I.T.O. had a lien of over one-half million dollars, which was growing at a rate of over $100,000 a year.

The provision requiring approval by the circuit court was requested by the ship owners, because Mr. Sellman was under guardianship protection and the Baltimore County Circuit Court was the court which had approved Mrs. Sellman as Mr. Sellman's legal guardian. Pursuant to this requirement of the settlement agreements, Mr. Smith drafted a Petition to Compromise Claim for submission to the Balti-

---

1. Sellman's wife was appointed as his legal guardian in 1982.

more County Circuit Court. The petition was drafted after the settlement agreements were executed and contained provisions which differed significantly from the provisions of the settlement agreements. Whereas the settlement agreements were silent as to whether I.T.O. had the right to suspend compensation payments, or to receive an offset against the proceeds of the Sellman settlement, the petition stated that I.T.O. had agreed to continue compensation and medical payments without interruption and that none of the proceeds of the Sellman agreement were subject to offset because they were intended solely to compensate Mrs. Sellman for loss of consortium. The petition submitted to the Baltimore County Circuit Court resulted in approval of the Sellman agreement.

In finding that I.T.O. was required to continue making both compensation and medical payments, the ALJ found that the petition was incorporated into the settlement agreements, and relied on this document and testamentary evidence to find that the parties in fact intended that I.T.O. continue making payments without interruption. The ALJ further found that the circumstances of this case obviated Mr. Sellman's responsibility under 33 U.S.C. § 933(g) to file a government form known as Form LS-33 reflecting I.T.O.'s written approval of its third-party settlement agreement. Finally, the ALJ determined that the proceeds of the Sellman agreement were for loss of consortium and thus not subject to offset.

The Board unanimously upheld the ALJ's determination that I.T.O. was not entitled to terminate benefit payments. The Board reasoned that the requirement of section 33(g) that a claimant obtain employer's written approval of any settlement claimant reached with a third party was inapplicable where, as in this case, employer was both a party to the third-party suit and helped negotiate the settlement reached between claimant and the third-party. The Board noted that, in any event, I.T.O. would have no right to terminate medical benefit payments because the statute only permitted termination of medical benefits where claimant failed to either obtain employer's written approval of the settlement or notify employer of the settlement, and there was no question that I.T.O. received notice of the Sellman agreement.

A majority of the Board also affirmed the ALJ's finding that I.T.O. was not entitled to offset the proceeds of the Sellman agreement against its liability under the Act. The majority found that since the settlement agreements were ambiguous as to whether I.T.O. had waived its statutory right to an offset, the ALJ properly relied on extrinsic evidence to determine the intentions of the parties and that substantial evidence supported his findings regarding the intentions of the parties.

One Board member dissented from the majority's determination regarding the offset issue. The dissenting Board member felt that I.T.O. had the right to either collect the entire $500,000 paid by the *Algenib* defendants immediately or to receive a credit against its future liability by suspending payments until its full offset was realized. The dissent also took the position that the petition to compromise claim was a separate document from the settlement agreements whose only purpose was to request the circuit court to approve the Sellman agreement, and that the circuit court's order did not approve the petition, but the Sellman agreement. Finally, the dissent argued that the ALJ's findings regarding the intention of the parties were not supported by substantial evidence because the ALJ had misconstrued relevant testimony.

■ Under 33 U.S.C. § 933(a), an employee entitled to compensation under the Act need not elect to pursue his worker's compensation claim to the exclusion of a negligence action against a third party. If, however, recovery is obtained from the third party, the employer is entitled to offset its liability under the Act against such recovery pursuant to 33 U.S.C. § 933(f). Section 33(g), 33 U.S.C. § 933(g), deals with situations where the claimant settles his third-party action. That section provides, in pertinent part:

> If the person entitled to compensation (or the person's representative) enters into a

settlement with a third person referred to in subsection (a) of this section for an amount less than the compensation to which the person (or the person's representative) would be entitled under this chapter, the employer shall be liable for compensation as determined under subsection (f) only if written approval of the settlement is obtained from the employer and the employer's carrier, before the settlement is executed, and by the person entitled to compensation (or the person's representative). The approval shall be made on a form provided by the Secretary and shall be filed in the office of the deputy commissioner within thirty days after the settlement is entered into.

33 U.S.C. § 933(g)(1).

Subsection 2 of section 33(g) states the consequences for failing to obtain the employer's written approval:

If no written approval of the settlement is obtained and filed as required by paragraph (1), or if the employee fails to notify the employer of any settlement obtained from or judgment rendered against a third person, all rights to compensation and medical benefits under this chapter shall be terminated, regardless of whether the employer or the employer's insurer has made payments or acknowledged entitlement to benefits under this chapter.

33 U.S.C. § 933(g)(2).

In this appeal, I.T.O. argues that the Board erred by ignoring the plain language of the statute and pertinent case law in denying I.T.O. the right to terminate benefits. I.T.O. argues that since Mr. Sellman did not obtain I.T.O.'s written approval of the Sellman agreement and indisputably failed to file the required LS–33 form in a timely manner, the statute requires that benefit payments terminate. I.T.O. further contends that the Board erred by finding that its participation in the third-party action and settlement negotiations rendered section 33(g) inapplicable, relying on case authorities holding that section 33(g)'s written approval requirement is to be strictly enforced without exceptions. I.T.O. further relies on case authorities holding that

the legislative history underlying the addition of subsection (2) and its termination provisions to section 33(g) indicate that its purpose was to preclude debate over whether an employer's conduct amounted to the equivalent of written approval and thus estopped it from denying that it had given written approval.

We find these arguments unpersuasive. The purpose of section 33(g) is to protect employer "against his employee accepting too little for his cause of action against a third party." *Banks v. Chicago Grain Trimmers Ass'n*, 390 U.S. 459, 467, 88 S.Ct. 1140, 1145, 20 L.Ed.2d 30 (1968); *Robinson Terminal Warehouse Corp. v. Adler*, 440 F.2d 1060, 1062 (4th Cir.1971). In other words, the written approval requirement prevents the claimant from acting unilaterally to the detriment of the employer by accepting less in settlement than it might be entitled to and thus reducing the employer's offset.

We agree with claimant and the Board that the purposes of section 33(g) would be ill served by permitting the termination of benefits where an employer has directly insured, by its own actions, the protection of its offset rights. In this case, I.T.O. directly participated in the third-party action against the *Algenib* defendants, and fully participated in the negotiations leading to the execution of "companion" settlement agreements which, as the Board stated, "were so intermeshed that they could be considered a joint settlement." After all this, and after accepting the settlement proceeds from the I.T.O. agreement, I.T.O. refused to give its written approval of the Sellman agreement.

▇ Our holding that an employer may not terminate benefit payments is not grounded in the view that the employer is estopped to deny that it gave written approval in this case. Rather, the employer's conduct in this case rendered section 33(g) inapplicable. The language of the statute supports this construction. Section 33(g) contemplates a situation where "the person entitled to compensation" reaches a settlement with a third party. This language reflects the concern alluded to earlier over

unilateral action which is detrimental to the employer. Conspicuously, the statute contains no reference to written approval or notice requirements where the employer participates in the settlements.[2] Accordingly, we conclude that written approval is unnecessary under such circumstances.

██ We next address whether I.T.O. is entitled to an offset under section 33(f). The Board determined that a provision in the I.T.O. agreement stating that responsibility for satisfaction of I.T.O.'s lien "remains with Mr. Sellman in the event that there is any recovery of any sums of money from any other party not named as a Defendant herein" could reasonably be interpreted as waiving I.T.O.'s right to offset the proceeds of Mr. Sellman's settlement with the *Algenib* defendants. The Board majority therefore concluded that the contract was ambiguous as to whether I.T.O. intended to waive its right to an offset, justifying circumvention of the parol evidence rule and permitting examination of extrinsic evidence, namely, the petition and the testimony of the attorneys involved in the case, to determine the intention of the parties. Even if we agreed with the Board's conclusion that the provision in the I.T.O. agreement was ambiguous, we find that the petition and relevant testimony do not support the conclusion that I.T.O. intended to waive its lien.

Initially, we agree with the dissenting Board member that the ALJ committed legal error in finding that the petition augmented the I.T.O. and Sellman agreements. The purpose of the petition was to obtain court approval of the Sellman agreement, and review of the petition and the circuit court's order discloses that this was the only result achieved. Paragraph 7 of the petition informed the court that the *Algenib* defendants, "in settlement of all claims of William H. Sellman, Jr.," offered a sum of $250,000. Paragraph 9 states that I.T.O. agreed to accept $250,000 in settlement of its claims against the *Algenib* defendants, and that I.T.O. will remain liable for all indemnity so that benefits "will not be interrupted." Paragraph 10 provides: "Rhoda Sellman, individually and on behalf of her minor children ... under the loss of consortium claims ... have also been negotiated and settled for the sum of [$250,000], *separate and apart from these proceedings* " (emphasis added).

The circuit court's order makes no reference to the matters contained in paragraphs 9 or 10. Rather, the court's order merely authorizes Mrs. Sellman and her attorneys to accept the $250,000 offer of the *Algenib* defendants "in full settlement of all claims of William H. Sellman" arising out of his injuries on the ship. Thus, the court's order reflects the fact that the court had no reason or authority to approve paragraphs 9 and 10 of the petition. Moreover, we find it particularly unlikely that the court would have approved paragraph 10, since it referred to an agreement which does not appear to exist and since, in any event, the petition states that Rhoda's alleged settlement was "separate and apart from these proceedings."[3]

Once paragraphs 9 and 10 of the petition are removed from consideration, there is no documentary evidence indicating that I.T.O. intended to waive its right to an offset. In finding that I.T.O. intended to waive its lien, however, the ALJ also relied heavily on testimony by Mr. Tobias to the effect that the parties intended that benefit payments to Mr. Sellman would continue, despite the Sellman settlement, without interruption. The majority of the Board found that the ALJ acted within his discretion in determining which testamentary evidence to credit. We agree, however, with the dissenting Board member that the ALJ misconstrued the testimony of Mr. Tobias.

---

**2.** We also agree with the Board that I.T.O.'s reliance on cases where the written approval requirement was upheld despite the employer's participation in the third-party suit is misplaced since, in those cases, the employer opposed the settlement.

**3.** We also reject William's contention that I.T.O. ought to be bound by the terms of the petition because it never objected to its provisions despite being sent a copy. I.T.O. was not a party to the guardianship proceeding before the circuit court, and had no duty to object to the contents of the petition.

Mr. Tobias testified that it was his understanding that under the agreements benefit payments were to continue, and mentioned at one point in his testimony that in a discussion with Mr. Hennegan, I.T.O.'s attorney, at a cocktail party in October 1984, Hennegan agreed with him as to his understanding on this point. As pointed out by the dissent, Mr. Tobias later corrected his statement, testifying that "I do not think the words continuation of compensation payments were mentioned by either of us and if, I think I may have suggested that, that if those words were expressed in the conversation, they certainly were not." Mr. Tobias further testified, more generally, that Mr. Hennegan never said anything to him about the continuation of payments. Even Sellman's attorney, Mr. Smith, conceded that the suspension of benefits was never discussed with I.T.O.'s representatives.

■ We note the Director's position that I.T.O. cannot recover its offset because at least some portion of the Sellman settlement proceeds must have been for loss of consortium by virtue of the fact that Mr. Sellman's family members were parties to the agreement, and I.T.O. failed to prove what portion of the proceeds were solely for William. We disagree. The Sellmans brought nine different causes of action against the *Algenib* defendants, only one of which was for loss of consortium. Since the Sellman agreement makes no attempt to match specific portions of the proceeds with specific causes of action, there is no way to determine what, if any, portion of the settlement was for loss of consortium. The Board has specifically upheld the employer's right to a total offset unless the settlement agreement specifically apportions the amounts intended for the claimant and the amounts intended for family members. *See Force v. Kaiser Aluminum & Chemical Corp.*, 23 BRBS 1 (1989). To accept the Director's position would require this Court to rewrite the Sellman agreement, which we cannot do. *See Kasten Constr. Co., Inc. v. Rod Enters., Inc.*, 268 Md. 318, 301 A.2d 12 (1973). *See also Automatic Retailers of Am., Inc. v. Evans*

*Cigarette Serv. Co.*, 269 Md. 101, 304 A.2d 581 (1973).

■ The Director also contends that I.T.O. is barred from recovering an offset because it indisputably waived its "lien" when it chose not to enforce its right to have the $250,000 in proceeds from the Sellman agreement transferred directly to itself. Instead, I.T.O. agreed to allow the funds to go to the Sellmans and simply ceased payments until its retained payments equaled the net value of the settlement. The Director avers that the lien waiver is rendered illusory if it is held that I.T.O. waived its lien, but did not waive its right to a credit for the very amount it could have collected immediately.

Section 33(f) provides no basis for treating an employer's right to an offset differently depending on the amount of time it takes to collect it. Moreover, an employer's decision to suspend benefit payments until it exhausts its credit provides claimants incentive to enter into a third-party settlement. By exercising its right to offset in this manner, employers allow the claimant to receive a large lump sum immediately rather than have the same funds disbursed to him in smaller increments over a period of time. This permits the claimant to use some of the funds to produce further income.

In cases where the claimant's third-party recovery exceeds the employer's liability at the time of the recovery, the employer ceases benefit payments until such time as the claimant's continuing medical expenses exceed the amount of the third-party recovery. *See Shoemaker v. Schiavone and Sons, Inc.*, 20 BRBS 214 (1988). The only factor which distinguishes this case from those cases is that here I.T.O. could have collected the entire $250,000 immediately because the amount of its liability was known. We see no reason to penalize an employer for voluntarily collecting its offset over a period of time. Such a practice aids employers by encouraging claimants to pursue third-party recoveries, and aids claimants by permitting them to receive a lump sum which may be utilized to produce further income.

Accordingly, the decision of the Board is affirmed in part and reversed in part. I.T.O. may not terminate either compensation or medical benefit payments, but is entitled to offset its liability against William's third-party settlement recovery.

AFFIRMED IN PART AND REVERSED IN PART.